I have reserved five minutes of my time for rebuttal. We ask that the judgment of the trial court be reversed and the case remanded for a new trial. In this case, we proved that Brad Stubblefield's motorcycle had a defective front brake, which resulted in corrosion being trapped inside the front master cylinder, trapping gas, which caused his brake to fail and injured him severely. Every bit of evidence at issue in this appeal goes to prove those points. More importantly, Suzuki's two expert witnesses directly contradicted those points, yet we were not allowed to impeach either of their experts with what Suzuki had written to its customers or to the United States federal government or what they had discovered internally in their investigations. The exclusion of all of this evidence created an atmosphere of disbelief, so prejudicial and so pervasive that it became affirmative proof of the lack of a defect. Counsel, before we get to that issue, don't you have to overcome on the jury verdict form question 1A, Roman numeral 3, the jury is asked a compound question, a two-part question. Do you find from the evidence that the front brakes were used by Brad Stubblefield on January 12, 2012, and they failed to function, they, the brakes, failed to function as expected? Now, that's a finding of fact that one of two things is true in the opinion of the jury, that the brakes either were not used, and I realize that that's contested, but that's what the jury found, that's part one of the question, or that the brakes were used and that they did function as expected. Isn't that the first hurdle you have to overcome before we get to the issue of the admissibility of the recall and some of the other assignments you've made? Well, it's the first issue that we have to overcome, but we cannot address that without addressing the excluded evidence. I understand. I guess what I'm suggesting is that isn't the evidence parsed out? You have some other assignments, which I assume you're going to get to, regarding the blog posts and some statements that were made immediately after by Mr. Stubblefield. Yes, sir. Those, I understand, but when we get to the issue of the recall and the design defect that you're trying to establish, you would still have to get through this question first before we got to that he did apply the front brakes and that they failed to perform and that they failed to perform because they were defectively designed as opposed to being maintained or left the factory defective. That's one question, but it combines an awful lot of evidence. As this court said in Davidson Oil v. Klockner 1, the first Klockner case, it is absurd to even suggest, much less claim, that the admissibility of such evidence can be determined by the jury's verdict after its exclusion. The argument that evidence is irrelevant because, in its absence, the jury reached the opposite result is facetious at best, and those are not my words, those are the words of this court. Well, then let me ask the question another way. How does the particular piece of evidence that you're talking about that you started your argument with, how does that relate to the fact-finding and your ability to prove to the contrary? Well, as to whether Brad applied his brakes, obviously it's the hand gesture and the comments in the hospital, which were one of the three points I was going to talk about. But that's different. You started out talking about the recall information, the subsequently provided information by the defendant, and that's what I'm focusing on. I understand the hand brakes and the comment in the emergency room. I understand the blog posts and their relevance to this inquiry. My question is limited to your, you started out talking about information that the defendant itself produced to suggest that there was a design defect and it existed at the time Mr. Stubbefield had his accident. Yes, sir. So my question is, how does the information regarding the recall pertain to this fact-finding by the jury? Because the recall, because number one, both of Suzuki's experts denied there was a defect. Both of Suzuki's experts denied that corrosion could cause a problem with brake operation. Todd Hoover denied that the accumulation of gas in the master cylinder could negatively affect braking power. Todd Hoover denied that stopping distances could be increasing the risk of a crash. They denied all of those facts. And that's exactly what Suzuki said in the recall. They say that the piston generates gas, which Hoover denies, which may not be adequately purged. Hoover said the side port does vent gas. He said gas, recall says gas remaining in the master cylinder can affect braking power. Again, braking power, that's the exact question that was asked of Mr. Hoover. Now they deny that power appears in the recall, but it does. So the recall shows negatively affect braking power. Over time, gas continues to slowly accumulate over the reservoir port. The brake lever may develop a spongy feel and, quote, stopping distances may be extended, increasing the risk of a crash. There's no question whatsoever that Brad's motorcycle had this defectively designed front brake on it at the time of the crash. Also, Dan Stubblefield, Brad's father, he testified that when he picked up the motorcycle that morning after the crash, he squeezed the front brake and was able to roll the bike freely. The brake did not work minutes or hours, you know, short immediately after the crash. And then we have the other comment from Brad about front brake, front brake, putting all of that evidence together, we have a defective front brake that doesn't purge gas. Brad's an experienced rider. He testified he would have applied the brake. We have a spontaneous utterance that he applied the front brake, and the front brake didn't work afterwards. All of that evidence goes to prove that the front brake, that he applied the front brake and that it did not function as expected. So we think that the totality of the evidence, had the jury heard this evidence to impeach their expert witnesses, we suspect, or we don't suspect, we believe we would have had a substantially different trial and a substantially different verdict. So I'm going to talk about three points. Those points are going to be impeachment, which I've addressed a little bit. It's always interesting when we get a, you know, we talk about the vanishing trial. We get gazoos of appeals based on summary judgments, 12B6, et cetera. So here we have the luxury of a fully tried case. That makes a big difference. Yes it does. Yes it does. And the third, I was going to talk about impeachment, causation, and the hand gesture, which I've already talked about. So the first issue is impeachment. Todd Hoover, the first of Suzuki's two expert witnesses, he only had two witnesses, he testified there's nothing wrong with the brake, nothing wrong with the design, it functions perfectly, et cetera. He also testified that he personally owns one of these motorcycles, and by the time of the Stubblefield trial, he had testified in two other jury trials. In one of those cases in California, he was asked about replacing the front brake on his When explaining why he replaced the front brake on his personal bike in the California trial, he said, quote, because I did not want to be riding around with a non-functioning front brake. Counselor, as I read the transcript of the trial itself, that particular, you went back and you examined, the court did, the district court did, the context in which that statement was made. And as I read that development of the context in which that was made, he testified that he was talking about a recall, and it was all about the recall. And all he was saying was that I wouldn't ride my bike because of the recall. So that seems to me to be, doesn't answer the question that he couldn't testify directly to the recall. Now, at the same time, the, what I think the defendants cannot do is to, is to then hide behind the recall to the extent that they denied that the product was defective, denied, and as I understand it, they omitted feasibility, but then backed off of it, or at least assertedly. Tiptoed around it, yes. My concern focuses on the strictures of the district court imposed upon the lawyers here in dealing with an admittedly difficult trial problem of dealing with the, we've got three actual trial judges sitting up here in trial of lawyers, of dealing with the problem of, that's presented by this policy-based evidentiary limitation, and it's very difficult to administer the trial. Well, the trial court used Rule 407 as an absolute impenetrable wall, repeatedly stating the recall is not admissible for any purpose whatsoever. That's not the law. The law is, if it's offered for a permissible purpose, then we go under the traditional rules of evidence, 401, 403. Focus, it'd help me if you'll focus upon the misuse of that, or you assertedly misapplied that doctrine. Yes, sir. And this could be fact-based, but help us with exactly what happened. Well, what happened was, just before trial, we'd argued motions in limine multiple times. Just before trial, we argued another motion in limine, or a second or third time on the same motion, to exclude the recall and other similar incidents. And the trial judge agreed that this court's unpublished opinion in Rutledge v. Harley of Brazos River, because Brazos River clearly holds that subsequent remedial measures and other similar incidents can be admissible to prove causation when causation is disputed. That's clear error. No question about it. Except that you're entitled legally to make impeachment use of the recall itself. Yes, sir. But that is that the product supplier, they can't, they have to deal, they have to confront this basic same issue. That is, they cannot get up on the stand and put their expert on and say, this product has no problems. That's what happens. It's perfectly designed, da-da-da-da-da. Well, simultaneously, there is the recall. You know the impeachment value. Wherein did the violation of the tolerance that the law gives to utilize the recall as for its impeachment value? Well, first, I would get down to the wherein did the district court cut you off? In the impeachment of Todd Hoover and in the impeachment of Kevin Breen, both of whom said there is no defect in the design of this front brake, both of whom said that gas will not affect braking power. Those two issues alone were impeachment. Also, and frankly, in opening statements, Suzuki's counsel said, ladies and gentlemen, y'all need to know, we stand behind this bike and the performance of its brakes. So this is right after the judge had just said that the recall is not admissible for any purpose, and I submit they took advantage of that ruling. Once they opened the door, we should have been allowed to go through it. So. What question did you ask that you were not allowed to, or did you get to ask the question? Ask the question, Mr. Hoover. Do you believe there's any defect in the front brake of the design of the front brake? No, there's no defect if it's maintained properly. Now, before or after the district court had admonished the parties of the consequences of the pretrial in the fourth week? That was after the pretrial ruling, but seconds before I was admonished again. So I see that my time is running. The other similar incidents, I'd like to just briefly talk about that. I'll tell you what, it's post-Thanksgiving, I'm feeling charitable. Mr. Clerk, give him five minutes on the clock. Give five minutes to the other side. We've got a lot going on here. Thank you, Your Honor. We're in a rush, but let's move with alacrity on some of your other issues. Thank you. The other similar incidents. Causation again, Brazos River has not been overruled by this court. There's no intervening change of law. The rule of orderliness requires that Brazos River still be followed by district courts in this circuit. Just to taper that, you'd urge to us that assuming error on that, it's reversible error as opposed to error, but not reversible in the context of this fully tried case. You're arguing it's reversible error. Yes, sir. It's reversible error because it had a cascading effect. We could not impeach witnesses. We could not use other similar incidents. Causation was hotly disputed in this case. Well, there's no doubt about that, but this case kind of has a real chain of things. Some of these issues surface later, all that. We go back to the cause. Anyway, just want to make sure I got you on that. Yes, sir. We got you. You say it was reversible error on the 407 case? Yes, sir. Yes, sir. And the other similar incidents. The rule in this circuit and every other circuit is that other similar incidents can be used to prove causation when causation is disputed in a product's case. And the focus on the analysis is supposed to be on the similarity of the products involved in the other incidents. And here we found hundreds, but we actually deposed nine different people, some of whom had lawsuits, some of whom didn't, who had suffered a sudden unexpected loss of brake pressure while riding, which Suzuki denies can happen. They were all riding bikes with the exact same front brake and the exact same defect, the zinc and steel connection in the side port, and who suffered a sudden loss of failure. That should be the analysis. Instead, the district court focused on irrelevant technical distinctions between the incidents themselves and found they were not substantially similar. For example, one person was turning right, another one was turning left. Those are dissimilar. One person was on an unfamiliar road, whereas Brad Stubblefield rode this route every day. Therefore, those are dissimilar. One was at night, et cetera. Those are irrelevant distinctions. One, which was particularly interesting, Derek Gerard, who we deposed out in Seattle, he had been General Mad Dog Mattis's personal bodyguard in the Iraq War, obviously someone of impeccable character. His testimony was excluded for the sole reason that it was a, quote, alleged crash and there were no witnesses to it. That's not the standard. The standard is you focus on the similarities of the products, similarities of the defect, and the causation of the defect. You don't count the witnesses to the other similar incidents. You don't distinguish one because it was at night and ours was in the daytime. So those are the significant differences. We should have been allowed to introduce those. Finally, one other issue of impeachment, which I think is important. Todd Hoover testified that when he tested the bike after the crash but before the break, the brake functioned perfectly. He said, and what he did was he squeezed the lever all the way to the grip and he measured 85 newtons, which is a measure of force. That's about 17 pounds. He said, for an old bike, I expect that that's functioning perfectly. Suzuki's internal documents, one of which we used with Mr. Hoover in his own deposition, says there's no difference between an old bike and a new bike. Brakes don't wear out like that. They work 100% of the time. And Suzuki's standard is you stop the lever 5 millimeters before you get to the grip and you're supposed to get 200 newtons, and anything below 160 newtons is considered spongy. Here, Mr. Hoover jammed his force measuring device against the grip and only got 85 newtons, less than half of what is expected and approximately half of a failing grade of spongy. But yet he was allowed to tell the jury that that is a perfectly acceptable test result. We were not allowed to impeach him with Suzuki's documents to the contrary. So add that to the stack of evidence that was improperly excluded for impeachment purposes. Did you have Suzuki documents that were extraneous to the recall? Yes. We had dozens of investigation documents, one of which we cited in our brief, the post-recall technical meeting minutes, which were admitted in other trials, by the way. And the judge would not let us even introduce that unless we had a sponsor. Well, that means we have to have a Suzuki witness on the stand to lay a foundation. Well, they don't call any Suzuki witnesses, so we could not offer those documents. So I see that my time is up. I appreciate your indulgence. All right. Thank you, Mr. Edwards. Mr. Edwards, you still have your rebuttal time intact. Thank you. All right. Mr. Drinkwater on behalf of Suzuki. May it please the Court. Wayne Drinkwater on behalf of Suzuki Motor Corporation. I'd like to follow the lead of my colleague and walk through some of the same things he did and try to do so with some fealty to the record. With respect to introducing the voluntary recall as impeachment, I think there are two reasons why that was improper. The first was if you will look at the plaintiff's brief at pages 11 and 12 and then the reply brief at pages 10 and 11, you will see precisely why they wished to offer it as impeachment. In particular, they wished to impeach testimony of our experts to the effect that the break was functional, it was safe. They wished, in other words, to introduce the recall, to impeach a denial of negligence or culpability. That was the purpose of it. Now, I call the Court's attention to the case of Hardy v. Scimitron, which is reported at 870 FedSecond 1007, a Judge Rubin opinion. Very similar situation involving a bacon slicing machine. Judge Rubin listened to arguments like that and made the point that if we admit a subsequent remedial measure to impeach what was there a denial of negligence, that is precisely the same thing as admitting it to prove negligence, which is the whole point of 407. Counsel opposite said that he would deny the opportunity to cross-examine your expert who said that the product was safe. And if you put on a witness, a company witness, and says that this product is safe and there's no defect, then if impeachment means anything, you can confront them with prior contrary statements by the company itself. Remember, though, Your Honor, in this case, the whole point of 407 is to prevent the use of subsequent remedial measures for that very purpose because, as Judge Rubin made the point, if you impeach somebody's denial of negligence with this... But under what circumstances, then, in your view, can impeachment operate as an exception to the prohibition against subsequent remedial measures introduction?  Or that it would be out, as Judge Rubin pointed out in the Hardy case? In this case, they state that, and in my look at the records, and that's the way I read it, too, the witness was maintaining that this was a safe product and that there was no defect. And if that's true, why shouldn't you be able to cross-examine them if impeachment means anything? In other words, they cannot, a plaintiff cannot use subsequent remedial recall to prove defect. But at the same time, you can't put on experts and say this product was safe and so forth without opening that door itself. And I read this record, and you danced all over that. Your Honor, one small point, and I don't wish to make too much out of it. I think our experts actually testified as engineers and testified about functionality, not defect. I think they did that. But let's pass that for the moment. Functionality, the breakdown worked, and we're talking about a defect. I'm sorry, I don't understand that. Well, Your Honor, 407, the policy of 407 is to prevent that. The Hardy case is not the only case in this circuit holding what I just said. Maybe I'm not communicating with you. I'm trying to understand. But perhaps you disagree with this. I would assume that the company in defending a product's liability case cannot put on its experts and having conducted a recall to correct a specific problem that's at issue in the case and put on experts to say that the product testified affirmatively that there was nothing wrong with the product. I believe that the expert could testify as our expert did here, and let me say why. They testified that this break was functional. I don't see the principle. You can tell me what they testified to, but do you agree with that basic premise? I think that there are cases consistent with what Your Honor just said. There certainly are. In this case, though, please, in this case, what our experts testified to based on facts on the ground was that this break was functional. They did not testify contrary to the recall. They did not take issue with the recall. They did not deny that under the conditions described in the recall, the consequences of the recall could occur. That is not what they said. They said that under this circumstance, those conditions did not exist. For example. What was their basis for saying that it was functional? Because they went out immediately, not immediately after the accident, but they went out after the motorcycle had been in the custody of the plaintiff for four years and tests were run. These tests were run by the plaintiff, two tests. One, a man named Preston Lynn went out without telling us, and he got the front brake to lock up, and the testimony from their experts and our experts is, if you can get the brake to lock the wheel, that's all a brake can do. It was functional. It was not, in their words, defective. Second, the panic stops, the performance stops, of David Boyd, which were conducted in 2016, their driver, what did they show? Well, we know what they showed. He went out, he slammed on the front brakes, and every time they did it, it stopped within about half the distance that the applicable federal motor vehicle standard said it should stop in. Now, this is four years after the accident when the brake has been in their custody, and the undisputed testimony is that after four years, there's only one thing that can happen to the performance of a brake if it's not maintained. This was not maintained. What's that? It gets worse. It gets worse. So the uncontradicted testimony based on these tests was that that brake worked just fine and would have worked just fine on the day of the accident. That is what our experts testified to, Your Honor, not that there was something wrong with the recall, that the recall was inaccurate. Nobody takes issue with that. What our testimony was, this machine on January the 12th, 2012, had functional brakes, and the reason it didn't stop was Branch Doublefield didn't apply the front brake. That's what the case was about. That's what Todd Hoover and Kevin Brady testified to. Now... I'm sorry. It didn't stop because he didn't apply the front brake? That's correct. And there was lots of evidence about why that happened. The gravel. Well, the gravel. He didn't apply the front brake. You saw the only skid mark out there was from the rear wheel. And what I think pretty clearly happened, and I think this is what the jury found, is he did not know that the ravine was over there, the embankment. He testified to that in his deposition. He had slowed down through application of the rear brake. He was now on the gore. He probably slowed down some more, intending to circle around and get back on the road. He comes up to the edge. Oh, my goodness. Down he goes. And you really couldn't come up with the jury verdict that Judge Englehart began his questioning with without finding that he didn't put on the brake. There really isn't any other way to come up with that result unless you find that he didn't put on the brake because all of the experts, Your Honor, agreed that these brakes worked, just that if you applied functional brakes, it would have stopped. Everybody agreed to that. Well, this one didn't stop. So one of two things happened. Either these brakes didn't work or he didn't put them on. Well, if you read the jury verdict form, you'll realize, I think, that the jury found he didn't put on the brakes. And as Judge Englehart started with, well, whatever the recall says, it doesn't say anything about whether or not Branch Doublefield put on his brakes. It also doesn't say anything about whether this particular motorcycle had defective brakes. It describes a condition, Your Honor, and the facts of that condition are not present here. They are not present here. If you read through that and ask yourself what was going on on the ground here, they weren't there. Now, everything I've said really relates to the use of proving, of using the recall for purposes of proving causation. Well, let me ask you to move you to another disputed point of disability, and that is the testimony of the fellow in the hospital. It was a brake. It was a brake. Talk to me about the ruling of denying that. Well, of course, and I don't want to let this pass too quickly, but everything I've said needs to be refiltered through the filter of 403. And we all need to ask ourselves, was it an abuse of discretion for the trial judge to try to keep the case on the track? With respect to the front brake testimony, here's how I take it. First, there's no question that it's hearsay. That is to say it's being offered to prove the truth of some matter asserted as the plaintiffs interpret the matter asserted. Brad Stubblefield does not remember either saying it, nor does he remember the events to which it allegedly relates. His father and his wife allegedly were in the room when he said it. They sat right there and they watched him, and they did not understand that the comments he was making were intended to convey a view that the front brakes didn't work and that's what caused the accident. And we know that because after that, both of them thought that the gravel had caused the accident. Dan Stubblefield sent out a blog post saying he didn't blame the brake. Kristen Stubblefield, I think, also posted to similar effect. So they heard him say it, and they didn't understand that what he was saying is, I put on the front brakes and it didn't work. Why wouldn't you leave that for the jury? That's a good jury argument for sure. Well, because there's a question about establishing a certain level of reliability for hearsay to go to the jury. Now, what are the exceptions that could apply here? There's three. Was it an excited utterance? Well, Judge Wingate looked at it and said, well, it wasn't made at the scene, and I don't know how long after the event it was made, and I don't know whether he was under any stress at the time, nor do I know whether he was medicated. So in my view, under his view, it didn't come in as an excited utterance. Was that an abuse of discretion? I think not. Was it a dying declaration? Well, of course not. There was no indication that Brad Stubblefield thought he was in danger of imminent death. And so that throws us over into the residual exception. Well, the same kind of, as I see it, vagueness and imprecision that attend the statement in the first place would certainly support a trial judge, Your Honor, exercising his discretion to say, I just think this is too ambiguous to go to a jury. It's just too ñ it's not clear enough. And I really don't see that you could say, with all respect, that it's an abuse of discretion to keep out from a jury a statement like this when the very people he was saying it to had no idea what he was talking about. So that's the point I wish to make, I think, on the front break statement. There are ñ there's one other ñ Of course, the balance of evidence was that the meaning came when they learned of the recall of the defect. Well, the opportunity came. The trial judge, it comes closest to me with, of course, I'm not suggesting reversible error or anything else, I'm not suggesting anything other than the fact that the credibility of those people under those circumstances with their economic interest at stake, which is what the district courts referred to, they got a lot of money they're going to get on this thing, da-da-da-da-da. That belongs to the jury. The jury's got a good sense, but the district judge wouldn't trust the jury to even decide that. Well, I do think that the proper analysis here, with all respect, Your Honor, is to look at the exceptions. I understand your threat. Okay. I'm not suggesting the contrary. I'm just trying to get the dimensions of the claim of error. This case is unusual in the sense that a lot of these issues are fleshing up a long time after this crash, four years after the reconstruction, the statements that weren't initially out, and the blogs that say one thing and so forth. I mean, this is a little bit different scenario than we typically get. It is. I will tell you, when I was reading the record, here's what struck me. This motorcycle and the brake were at all times in the custody of the plaintiffs. We never had custody of it. The undisputed testimony was the only thing that could happen to brakes after four years of sitting around is they get worse. They go out with their experts, their experts, and they test it twice, and it stops on a dime. It works. Now, what is the evidence that it didn't work? There's no testimony when he even put the brakes on. We've got lots of reasons why he wouldn't have, and the jury found that he didn't put them on. It's not that he had a death wish. It's that he didn't appreciate that that ravine was over there. He didn't appreciate any peril, so he didn't do it. That's what happened. But how in the world someone could say that there's evidence that could even go to a jury that they didn't work in light of the test is just beyond me. It really is. But it did go to the jury. Was there an accident reconstruction immediately after the crash in the sense the rear skid marks that you spoke of? Was that snapshotted immediately after the accident scene? It just seems like a lot of stuff happened well after the accident. Excellent question. Here's what happened, Your Honor. Dan Stubblefield, the daddy, and I think a brother, went out to the scene and took pictures the day or two later. I think they were just doing it. They had a terrible accident, so they wanted to preserve any evidence. They observed in the photographs, and you'll see them in the record, the rear wheel marks. But other than that, and Dan Stubblefield, I think, rode the bike around the neighborhood a little bit, I think. But other than that, the answer is no. There was no accident reconstruction that occurred immediately after the accident. In fact, nothing happened after the accident until the recall was announced, and then light bulbs started going off, I guess. But there was no indication that anybody in that family thought there was anything that the bike did or didn't do that caused this accident. Another thing that strikes me about this, and I think Judge Inglethorpe began with it, is particularly with respect to the recall, the conditions set up in the recall that are described on its face simply have nothing to do with whether or not Brad Stubblefield put on those brakes, whether the recall had come in or not come in. The jury made this factual finding, and to me, that should be the end of it, because it is a factual finding that the condition of the model, the condition of the recall, is indifferent to. And so that just struck me, as I say, that that's the end of it. I wish to call the court's attention to the replibrary, because you heard a little bit of it a minute ago. I predict you're going to hear more of it. You will see that the replibrary is speckled with complaints about things that have not been raised as issues on appeal. There is no, for example, issue raised on appeal with respect to any expert testimony by the plaintiffs that was excluded. None. Zero. Anything that is in the replibrary, I just ask your honors to look carefully to see whether or not any of the complaints made in the replibrary were assigned as issues to which we had a chance to respond, and the answer is not really. It's all new, and none of these things are issues raised on appeal. With respect to the other accident documents, as best I can tell, those things share one common ground. They involved accidents to motorcycles, but I see nothing in those other accidents that would give any rational person a basis to say that the same problem that allegedly afflicted this motorcycle, and that is described in the recall, occurred with respect to any of the other nine. Now, we had guys flying over handlebars and landing in the back of pickup trucks up ahead and all kinds of weird things happening, and there may very well have been some issue with some brake on some motorcycle, but to say that any of those accidents were substantially similar to the condition caused by the recall is fanciful. It simply never happened. I have exceeded my time, I think, and I thank the court for its attention. If y'all have any questions on any other issues, I am certainly prepared to make them. Well, not only is counsel's argument, and although he's limited in time, he couldn't argue everything he wanted to argue, but as I gather, his main opening was confined to these evidentiary issues to which they argue. His opening argument was confined to evidentiary issues which they say are reversible error, not just error, but reversible error notwithstanding a fully tried jury case. These were so they're errors of the reversible nature. So I guess I say viewing them under 403 or whatever, if error or any of them reversible error, I know you argue they aren't errors. I got that part. Are they reversible errors in any respect? I don't think so. I really think that all of these things really fall, and I thank all of y'all, the trial judges. These are within the lines of a trial judge making a judgment call one way or the other. There are reasons. I have a question that's not really controlling, maybe not even relevant to your case, but how many jurors did the judge seat down there? Who? How many jurors did he seat? I think it was a 12. Twelve, Your Honor. Good for him. And it was unanimous. Oh, yeah, that was my personal quarrel with seating six-person juries. I believe in 12-person juries. We don't have any issues on appeal with respect to the jury verdict form or instructions or any of that? No objection was made to the verdict form or to the questions that were asked, and no attempt was made to ask additional questions. And finally, as I sit down, don't think that the only evidence available to this jury was the recall. The plaintiffs put up two experts, and they testified in substance about the claims that they now seek to pull out of the recall. That is, the jury heard all this. They heard it through the plaintiff's experts. Nobody was shut down, and no complaint is made properly on appeal that any expert witness of theirs was denied an opportunity to say whatever was on his heart. Thank you. Thank you for your point. All right. Not yet, not yet. I know you're chomping at the bits there. Just hold your seat belt for a minute. All right. Let's hear from this, and then you get to come back. Yes, Your Honor, and I'll be brief because I wasn't even mentioned in the first argument by the appellants. I am Mark Jicken, along with Carolyn Ivanoff. We represent Nissan Coggio Company Limited, and for brevity, I'll call it NK for the court. Judge Wingate thoroughly and properly considered NK's motion to dismiss for lack of personal jurisdiction, including all of the arguments that the plaintiffs make of waiver, and he properly granted the motion. There's no argument that there's no personal jurisdiction under Mississippi's long-arm statute or the U.S. Constitution. And this court, based on the Fifth Circuit case of In re Dupuy Orthopedics, is to look at the issue of waiver under an abuse of discretion standard. There's no argument that NK raised in its original response and its answer, its defense, that it denied personal jurisdiction. In the reply, I'll just mention a couple of things we didn't get a chance to talk about in our response. They mentioned special appearance. As the court, I think, is well aware, special appearance was abrogated by Rule 12b, and the Fifth Circuit, in the cases of Bayou Steel and TWA v. Maddox, both upheld that you need not file a special appearance as long as you meet Rule 12b, which is in your response you denied personal jurisdiction. There's no argument, Your Honors, that there were significant delays, and during this case there was a stay of all proceedings for five months, a protective order that was argued for over one year, and that Plaintiffs and Suzuki both moved for four separate continuances. These delays were so substantial that in December of 2016, Judge Wingate restarted the case. He issued a brand-new case management order and asked the courts to state their position. At that point, N.K. again stated, We continue our objection to personal jurisdiction in this case in the court-required status report. Three months after the new scheduling order, we moved our 12b-2 motion, and that was filed even before the deadline to the amendments or the pleadings or the joinder was filed. Before the pleadings were cemented, as Judge Wingate said in his order, he said, Plaintiffs resort to a waiver defense. While interesting, it does not de-energize Nissen's motion. Nissen raised the defense of lack of personal jurisdiction in its initial answer and abided by that position throughout. When Nissen filed its motion, the pleadings were not yet encased in cement. Since discovery was yet ongoing and the scheduling order's date for amending the pleadings had not even occurred. Your Honor, I would cite to you the Fifth Circuit decision of Brokerwood. In that case, they stated there's no bright-line rule regarding waiver, but it overturned the district court's finding of waiver, saying that where a defendant filed no counterclaim or where a defendant doesn't move on the merits, lose, then try to do a personal jurisdiction motion, then you shouldn't find waiver, and that's the situation we have here. Brokerwood also talked about if you have periods of delay or dormancy like we had in this case, then you should not find waiver. I've run out of time, so I'll turn it over. Thank you, sir. Now, Mr. Edwards, you're back up. Thank you, Your Honor. I apologize for trying to jump a little early. As to Nissen, I will just simply say that Nissen participated in this case for over 21 months without raising a specific objection to personal jurisdiction. In their answer, they had a general denial as to jurisdiction. There was not a separate affirmative defense, nor was there a motion to dismiss for lack of personal jurisdiction. They waited 21 months. There was over 100 different docket entries. They participated in discovery. They attended depositions. They served as interrogatories, all sorts of activities. So I would rely on the case of National Union Fire Insurance Company v. Blasio, which is a district court case in which Blasio, the defendant, participated for 13 1⁄2 months, far less than Nissen did in this case. And the court applied the standard and said they'd waive their defense by not raising it timely. As to Judge Engelhardt's very first question about the interrogatory and the verdict form, that was that the front brakes were used by Brad Stubblefield on January 12, 2012, and they failed to function as expected. The jury was not given the opportunity, and it's not an issue on appeal. I understand that. But they were not given an opportunity to split that question up to say. Back to the charge. I understand, so I'm just pointing that out. If they found that the brakes were not defective, they had to check no. They had no other option. But I will move on to other arguments. First, as to what Todd Hoover actually said, question. Now, in your opinion, there's nothing wrong with this front brake design, right? Answer. As long as it's properly maintained, I agree with that, yes. Question. So you have no questions or criticisms of the design on the front brake? The first part of that question. The previous question? No, the first part of that question. So you have no questions or criticisms of the design of the front brake master cylinder on Brad Stubblefield's bike as you found it? On his bike. On Brad Stubblefield's bike, not Todd's bike. Answer. It didn't have the OEM original equipment model lever on it, but no, the design, I don't. And what we're dealing with here, I apologize, I left mine. What we're dealing with here is impeachment after the jury's already heard testimony from two expert witnesses about the defect and about causation and all of this stuff. So the risk of unfair prejudice by impeaching a witness with testimony directly contrary to what he has just said in the recall is lower than if we'd put it up on a poster board and showed it during opening statement. We've already established our case. We're attempting to contradict their witness. And I submit that Rule 407, the comments say, it remains the case that if offered for an impermissible purpose, it must be excluded. And if offered for a purpose not barred by the rule, its admissibility remains governed by the general principles of 402, 403, 801, et cetera. So I submit that we should be encouraging truthfulness from expert witnesses when they testify in defense. And in this case, Todd Hoover is Suzuki. He is speaking for them. And if he says something directly contrary to what Suzuki has told the United States federal government, he should be held accountable for it. Now, their option would be don't put up a witness to refute or disagree with the recall. That's a perfectly acceptable way of defending a case. But if you're going to get him way out on the end of the plank saying stuff that Suzuki has disagreed with in writing to the United States federal government, it's not my fault that I should be entitled to impeach him. If they're going to go that far, they need to suffer the consequences. Now, I agree with Judge Higginbotham that it is an abuse of discretion standard if the court excludes evidence but applies the correct rule. If the court uses the incorrect rule, it's not an abuse of discretion. It's de novo. Judge Wingate did not apply the correct rule on excluding the hand, the front brake, front brake comment. Number one, people don't forget to apply their front brakes. So the argument that he forgot is just fiction. The standard, and he was clearly within a couple of hours of the crash, and the test wasn't at the scene. No, the test is whether he's still under the stress of the event. And here he's still under the stress. And if I may. A post-accident reconstruction by himself, he said that the memory filled in from what other people told him what happened in the gravel. Of course, the argument would be that the last thing he's going to do is to squeeze that hand brake if he's traveling over gravel on the motorcycle. He had 132 feet after he cleared the gravel before he got to the grass. So he agrees he would not have applied the front brake in the gravel, but over the next 132 feet he would have applied the front brake. The jury knows that too. All right, one sentence to conclude. No commas, no semicolons. In Davidson Oil Supply Company, admitting two out of 13 other similar incidences was reversed. Here we had zero. Those should have been admitted to prove causation. All right. Thank you, sir. Thank you. All right. Thank you, counsel, for the briefing, robust argument in the case, very serious injuries. We've got it. We'll take it under submission and we'll rule on it in due course.